RS+

FILED

13 OCT 11 PM 2:25



# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEX WISIDAGAMA,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**  **13MJ3783**<br><br>Title 18, U.S.C., Sec. 371 – Conspiracy to Defraud the United States |

The undersigned complainant being duly sworn states:

Beginning no later than on or about September 2011, and continuing up to September 16, 2013, defendant ALEX WISIDAGAMA, and others, did knowingly and unlawfully conspire to defraud the United States, and one or more conspirators committed an overt act in furtherance of such conspiracy, with such offense begun or committed outside any particular district; all in violation of Title 18, U.S. Code, Section 371.

The complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

James McWhirter, Special Agent, DCIS

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 11 DAY OF OCTOBER, 2013

The Honorable Jan M. Adler
United States Magistrate Judge

**PROBABLE CAUSE STATEMENT
IN SUPPORT OF CRIMINAL COMPLAINT**

I, JAMES G. McWHIRTER, being duly sworn, depose and state as follows:

**I**

**AFFIANT**

1.      I am a Special Agent with the Department of Defense, Office of Inspector

General, Defense Criminal Investigative Service ("DCIS"), Long Beach Resident Agency. I

have been so employed since May 2009. Prior to my employment with DCIS, I was a special

agent with the U.S Postal Service Office of Inspector General for approximately two years and

prior to that a special agent with the U.S. Army Criminal Investigation Command for

approximately 10 years. In addition to my law enforcement experience, I was employed for

approximately 9 years as an auditor for the Defense Contract Audit Agency. I have received

specialized training in the investigation of various financial and white collar crimes and I have

personally conducted or assisted in the investigation of violations of U.S. law to include bribery,

kickbacks, public corruption, conspiracy, theft, money laundering, conflicts of interest, mail

fraud and anti-trust violations. I have prepared numerous affidavits to support the establishment

of probable cause for search and arrest warrants. I am familiar with the facts set forth below

based upon my own investigative findings and conversations with other participating law

enforcement agents.

**II**

**INTRODUCTION**

2.      In conjunction with the United States Department of Justice ("DOJ"), the Naval

Criminal Investigative Service ("NCIS"), the Defense Contract Audit Agency ("DCAA"), and

colleagues from DCIS, I have been investigating, among other allegations, fraud and bribery

1

allegations involving Glenn Defense Marine (Asia) ("GDMA"), which acts as a general contractor to the United States Navy. As part of this investigation, agents are examining whether GDMA and its officers and employees committed fraud in the performance and billing of its contract to perform ship husbanding services to the U.S. Navy; whether things of value were given to various U.S. Navy and other government personnel by GDMA; and whether GDMA, its employees and agents, and U.S. Navy and other government personnel have obstructed justice.

3.    Based on the facts as set forth below in this affidavit, I respectfully submit that there is probable cause to believe that ALEX WISIDAGAMA, GDMA's General Manager Global Government Contracts, and others have conspired to defraud the U.S. Navy in violation of 18 U.S.C. § 371.

4.    As defined by 18 U.S.C. § 3238, this offense was begun and committed on the High Seas or otherwise out of the jurisdiction of any particular district, and thus, venue is proper for this offense in the Southern District of California, as the District in which one or more joint offenders, namely WISIDAGAMA, will be arrested in connection with this offense.

5.    The facts set forth in this affidavit are based upon my training and experience as well as my and members of the investigations' personal observations; review of documents, telephone records, government contracting records, and other evidence; interviews of witnesses; and review of physical evidence obtained during the course of this investigation. Because of the limited purpose of this affidavit, it does not set forth all of my or members of the investigations' knowledge about this matter.

## II

## FACTS ESTABLISHING PROBABLE CAUSE

6.    The U.S. Navy is a branch of the U.S. Department of Defense, whose mission is

2

to maintain, train and equip combat-ready naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas. The U.S. Navy Naval Supply Systems Command ("NAVSUP") is a command within the U.S. Navy, which is responsible for the global supply and delivery of goods and services to U.S. Navy personnel and warfighting assets. The U.S. Navy Fleet Logistics Commands ("FLC") are subordinate commands of NAVSUP located in various domestic and foreign locations and they provide logistics support for all naval installations and vessels operating in each location's area of responsibility. In particular, the NAVSUP FLC commands are responsible for soliciting, awarding and overseeing contracts awarded to entities for goods and services, including ship husbanding, required by the U.S. Navy in each specific FLC's area of responsibility. NAVSUP FLC in Yokosuka, Japan ("FLC Yokosuka") supports naval installations and vessels operating in Japan, Hong Kong, and Russia. FLC Yokosuka also oversees the operations of a Detachment in Singapore ("FLC Singapore"), which supports naval installations and vessels in foreign countries, including Singapore, Indonesia, the Philippines, Thailand, Cambodia, Vietnam, Australia, and elsewhere.

7.     GDMA is a multi-national corporation with headquarters in Singapore and operating locations in other countries, including Japan, Singapore, Thailand, Malaysia, Korea, India, Hong Kong, Indonesia, Australia, Philippines, Sri Lanka and the United States. GDMA is owned and controlled by LF, the Chief Executive Officer/President of GDMA, and who oversees the daily business and operations of the company. LF is assisted by a core management team, including WISIDAGAMA, General Manager Global Government Contracts; HP, Vice President Worldwide Contracts; and NP, Vice President Global Operations. GDMA also employs Country Managers for each of its operating locations in foreign countries.

8.     GDMA is a commercial and government contractor whose main business involves

3

the "husbanding" of marine vessels, and as such, GDMA is known as a "husbanding service provider" ("HSP"). "Husbanding" involves the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when they arrive at port. Examples of items and services required by ships and submarines when in port include tugboats, fenders, port authority/custom fees, security, provisions (food), fuel, water, trash removal, collection holding and transfer of liquid waste ("CHT"), transportation, and many others.

9.     Many of these items and services are supplied by lower tier subcontractors; however, GDMA does own a vast array of assets, including tug boats; water, trash, and CHT barges; docking equipment; small vessels for patrol (i.e. picket boats); passenger shuttles; security barriers; and other miscellaneous equipment it uses to fulfill husbanding requirements.

10.     GDMA has been husbanding vessels for the U.S. Navy for over 25 years. In or about June 2011, NAVSUP awarded GDMA three regional contracts to provide husbanding services to U.S. ships and submarines at ports throughout Southeast Asia (Region 2), Australia and the Pacific Isles (Region 3), and East Asia (Region 4). The Region 4 contract is managed by FLC Yokosuka, and the Region 2 and Region 3 contracts are managed by FLC Singapore.

## A.     The "Region 2 Contract"

11.     On November 3, 2009, the U.S. Navy issued Solicitation N62649-09-R-0041 requesting bids from potential commercial sources to provide husbanding services to support the U.S. Navy in Region 2. In June 2011, the U.S. Navy awarded GDMA the Region 2 contract, structured with a first year base value of $25 million, which the U.S. Navy could opt to extend for up to four additional years, for a total base value of over $125 million. Within each region, including Region 2, certain ports are more lucrative than others. According to GDMA correspondence, which I have reviewed, LF and other GDMA employees referred to these ports

4

as "Pearl Ports."

12.     The Region 2 contract contains three main provisions for the pricing of different types of ship husbanding services. First, for each port, GDMA and the U.S. Navy agreed to fixed prices for various, enumerated contract line-item services ("CLINs"). For rendering these enumerated line-item services, GDMA can invoice the U.S. Navy at the fixed price, irrespective of fluctuations in the actual cost to GDMA of providing the service.

13.     The Region 2 contract also provides for "incidentals," which are those items that fall within the general scope of ship husbanding services, but were not enumerated by the U.S. Navy as fixed price items. For example, if a U.S. Navy ship requests a larger bus than is enumerated as a fixed price line-item, then that larger bus would be classified as an incidental. The Region 2 contract provides that for each incidental item requested by the ship, GDMA must obtain at least two competitive quotes for the service and provide those quotes to the U.S. Navy via an Online Pricing Application ("OPA"), hosted by GDMA. GDMA is allowed to submit its own quote as one of the competitive market quotes, but it must disclose any profit or markup. As part of its OPA submission, GDMA also provides an "AGR Approval Form" (AGR is Authorized Government Representative) in which GDMA recommends a particular source. The U.S. Navy can then choose which vendor to use for the requested Incidental service, and uses that form to document its selection and approval.

14.     Included within the category of Incidentals is fuel, which is handled slightly differently. In the case of fuel, the Defense Logistics Agency for Energy ("DLA Energy") contracts directly with companies throughout Region 2 to provide fuel for U.S. Navy ships at a set price at certain ports.[1]  According to the Region 2 contract, if DLA Energy holds such a

---

[1]  U.S. Navy ships use two main types of fuel – "F-76," which is the U.S. Navy's specialized fuel specifically constituted for warships and commercial Marine Gas Oil ("MGO"). The U.S. Navy has very specific

contract, U.S. Navy ships must procure fuel using that contract. If no DLA Energy contract is available, then the Region 2 contract requires GDMA to inquire with the host nation whether it is possible to procure fuel through that nation's government. If neither of those options is available, the ship may either use DLA Energy's open market purchase program, called SEAcard, by which DLA Energy requests bids from market participants, or the ship may request that GDMA, as the HSP, arrange for fuel delivery. As with provisions, if GDMA arranges for fuel delivery, the Region 2 contract reimburses GDMA for the fuel "at cost," and for its efforts in arranging the purchase and delivery of the fuel, GDMA is paid a separate fixed fee.

15. In addition to fixed price line items and Incidentals, the Region 2 contract also provides specifically for "Port Tariff Items," which are ship husbanding services provided by an established "Port Authority" and charged at published rates ("Port Tariff Rates"). GDMA is required to use the established Port Authority to provide such Port Tariff Items, if the Port Authority requires it. If the Port Authority does not require this, then GDMA is to follow the contractual procedures covering incidentals. For Port Tariff Items, GDMA is required to submit copies of all Port Tariff Rates, translated into English, to the Supply Officer aboard each ship entering port. GDMA is subsequently allowed to invoice the U.S. Navy for the actual cost incurred to the Port Authority. To verify these costs, GDMA must also submit final invoices from the Port Authority prior to payment.

16. GDMA's specific responsibilities for any given port visit are determined when it receives the Logistics Request ("LogReq") from the U.S. Navy. The LogReq is typically drafted by the Supply Officer onboard the U.S. Navy ship, and provided to GDMA approximately 30 days prior to arrival. The LogReq outlines all of the husbanding services requested by ship. During the port visit, the Supply Officer typically interfaces directly with GDMA to coordinate

requirements for fuel, including that it contain zero percent Fatty Acid Methyl Ester, commonly known as biodiesel.

6

the delivery of the services outlined in the LogReq, and at the end of the port visit, GDMA

presents an invoice that the Supply Officer signs to affirm that the listed husbanding services

were provided. The Supply Officer then submits the invoice to the ship's Disbursing Officer,

who issues a check for payment to GDMA and delivers that check to GDMA's representative at

the port.

## B.    GDMA's Fraud Scheme

17.     As set forth below, beginning at least in or about September 2011, GDMA, LF,

WISIDAGAMA, and others conspired to defraud the U.S. Navy in the performance and billing

of the Region 2 Contract. Specifically, among other actions, the co-conspirators knowingly and

unlawfully (1) submitted and caused to be submitted fraudulent competitive quotes for Incidental

services, thereby allowing GDMA to win the award for those items without regard for the

competitive prices prevailing in the marketplace; (2) submitted and caused to be submitted

fraudulent quotes, and made other fraudulent misrepresentations regarding the purchase of Fuel,

thereby allowing GDMA to charge inflated prices to the U.S. Navy, rather than what GDMA

actually paid for Fuel; and (3) submitted and caused to be submitted fraudulent invoices from

non-existent Port Authorities, thereby allowing GDMA to charge inflated prices to the U.S.

Navy, rather than what GDMA actually paid to the bona fide Port Authorities.

### i.    *Incidental Services*

18.     On September 27, 2011, prior to the port visits of USS Dewey and the USS

Pinckney to Maura, Brunei, a contracting specialist with the Navy's Singapore contracting office

emailed GDMA's Vice President, referred to here as "NP," informing him that the ships "require

24 hour CHT removal services. Please provide us with the demurrage charges if applicable."

NP responded the next day that the cost would be $480/hour. The Navy official replied, asking

7

NP if the quotes to support such charges had been uploaded to OPA.

19.    On September 27, 2011, NP forwarded this chain of emails to WISIDAGAMA,

two of LF's email accounts, and another GDMA employee referred to here as "L":

*[L], Need your help to print and scan these quotes to [R]ichard to upload to OLPA*
*[OPA] for the Demurrage charges for CHT in Brunei. I've included the GDMA quote*
*and AGR. The next email I send you will have the sample signatures for the*
*Archi and Harbor link quote. Alex, let me know what you think.*

20.    Attached to NP's email are four documents: (1) a Microsoft Word document

labeled "Archi – CHT quote;" (2) a Microsoft Word document labeled

"DEW&PKN_AGR_CHT_DEMURRAGE (BRUNEI 2011);" (3) a Microsoft Excel document

labeled "GDMA_DEW&PKN_CHT_DEMURRAGE (Brunei).xls;" and (4) a Microsoft Word

document labeled "Harbor Link – CHT Quote.docx."

21.    Investigating agents examined the metadata attached to the first of these

documents (the Archi CHT quote), and determined that "NP" was indicated as its author and that

it had a "created" date of September 27, 2011.  According to a similar analysis of the metadata,

NP was also the author on the Harbor Link CHT quote.  According to market research,

interviews with GDMA employees, and a review of U.S. Navy documents, the investigative

team has been unable to locate any evidence that either Archi or Harbor Link is a real company

providing CHT barge service; rather, based on the metadata of the documents, it appears that NP

fabricated these quotes in order to justify the price bid by GDMA in its submission to provide

continuous CHT service.

22.    In the AGR Approval Form attached to the above email, NP wrote:

*GDMA solicited 2 sources for the hire of a CHT barge / tanker to support CHT*
*demurrage to USS DEWEY and USS PINCKNEY PVST to Muara, Brunei. Additionally,*
*GDMA provides a quotation to utilize GDMA owned assets of 1500 ton capacity CHT*
*tanker. ... Based on receiving 2 quotations, GDMA's price of US$72,960 represents the*
*lowest price and is considered fair and reasonable considering the lack of infrastructure*

*in Brunei to support this requirement. Supporting documentation is available for review.*

23.      Also on September 27, 2011, WISIDAGAMA replied to NP's email: "Hi [NP], Looks good to go!" Approximately 45 minutes after WISIDAGAMA's email, GDMA employee L replied to NP saying, "[S]ee attached quotation (ADC, Harbor Link and GDMA) and 1 AGR for CHT demurrage as follows (with Signature)." Attached to L's email are four documents, all PDFs, which according to my review, appear to be the same as the four attachments from NP's email, except that a signature has been added to each. They have been converted to PDF and apparently scanned, resulting in a grainier appearance. LF was cc'd on these emails.

24.      In another representative example, in Malaysia, on September 22, 2011, NP emailed LF and WISIDAGAMA, stating that he would upload to OPA quotes for tugboats for a visit of the USS Emory S. Land and USS Columbia to Kota Kinabalu. Later on the September 22, LF replied to NP, WISIDAGAMA and another GDMA employee, saying "Neil, It's time we become more savvy and get real q[uo]tes from PSA and other reputable tug companies? I have told you all for months to prepare not this Ali Baba tugs responses." According to research conducted by investigating agents, "PSA" is PSA International Pte. Ltd., formerly known as the Port of Singapore, a large port operator in Singapore.

25.      On September 23, 2011, the Supply Officer onboard the USS Columbia wrote an email to glenncom@glennmarinegroup.com, cc'ing NP and HP, complaining about the high cost of tugboats in Kota Kinabalu. In apparent response, LF emailed NP, cc'ing WISIDAGAMA and HP, asking if NP had uploaded the three tugboat quotes to OPA.

26.      NP responded to LF, cc'ing WISIDAGAMA and HP: "Sir, Attached are the three quotes I sent out yesterday for approval. If all is gtg [good to go], I will upload those today. Prices are the same as the previous Frank Cable and Houston pvst [port visit]." Attached to this

email are two quotes purportedly from companies known as Capricorn Freight Services and Mulia Jelata, both stating that they cannot provide tugboat service at this time. According to the Capricorn Freight Services website at http://www.capricorn.com.my/our-services.html, Capricorn is a freight forwarder, which I believe, based on my training and experience and the services listed on Capricorn's website, is not a market provider of tugboat services.

27.     According to U.S. Navy records that I have reviewed, the U.S. Navy chose GDMA to provide the tugboats for a total cost of $235,052.

28.     Nor was GDMA's creation of fraudulent bids isolated in Brunei and Malaysia. In November 2011, a three-ship strike group, consisting of the USS Pinckney, the USS Wayne E. Meyer, and the USS Dewey, scheduled a port visit in Phuket, Thailand. In the LogReq for each ship, issued in approximately September 2011, the U.S. Navy requested several services that GDMA treated as Incidentals, including a fleetlanding or breasting barge, a gangway (the connection between a ship and the pier across which sailors can walk), Yokohama marine fenders (bumpers placed on the outer hulls of boats to prevent collision), and various barges to load and unload trash, CHT, drinking water, and others items.

29.     According to U.S. Navy documentation which I have reviewed, GDMA uploaded into OPA three quotes to supply each of the following services to the USS Pinckney: CHT barge, gangway, trash barge, water barge, concrete blocks, and container barricades. For each one of these services, GDMA submitted a quote on its own letterhead, and at least two other quotes from purported local suppliers. In every case, the other suppliers' bids were either higher than GDMA's quote, or stated that they could not provide the service requested. In each AGR Approval Form drafted for the U.S. Navy, GDMA represented that it had solicited competitive quotes to provide the service and recommended that the U.S. Navy procure the services from

GDMA. Lastly, in every case, the final invoice from GDMA to the U.S. Navy reflected the same price as GDMA's quote, indicating that the U.S. Navy did, in fact, select GDMA to provide all of these services.

30.     According to information obtained by the investigation, each of these quotes from an allegedly competitive source was fraudulent. Each was uploaded into OPA (along with a quote from GDMA for each service) in advance of the USS Pinckney strike group's arrival in Phuket. In each instance, as presented to the U.S. Navy through the OPA system, GDMA was the low cost bidder and thus won the award to provide the Incidental service.

31.     In the aggregate, from the time that the USS Pinckney, USS Dewey, and USS Wayne E. Meyer visited Phuket in November 2011, until approximately August 2012, every time a U.S. Navy ship arrived in Phuket and requested any of the above Incidental services, GDMA uploaded into OPA copies of the same fraudulent quotes, often without even changing the dates.

32.     According to documents I have reviewed and an analysis by DCAA, in total, as a result of port visits to Phuket, Thailand, from approximately September 2011 until June 2012, GDMA submitted false competitive bids for Incidental services to the U.S. Navy via OPA approximately 177 times, including approximately 35 separate fraudulent quotes, some of which were submitted multiple times. For the vast majority of such Incidental services, GDMA also submitted a bid, and on each occasion when it did, GDMA was the low-cost bidder and was thus awarded the contract to provide the Incidental service.

33.     According to many documents I have reviewed, this scheme worked the same way at the ports in Laem Chabang and Sattahip, Thailand. As a pattern, the GDMA Country Manager instructed an employee to prepare fraudulent quotes for a particular Incidental service once the incoming U.S. Navy ship made its request for that service. From that point forward

11

until approximately June 2012, GDMA submitted those exact quotes nearly every time a ship requested the same service, often without changing the date of the fraudulent quote.

34.     In total, according to documents I have reviewed and an analysis by DCAA, as a result of port visits to Laem Chabang and Sattahip, Thailand, from approximately September 2011 until June 2012, GDMA submitted false competitive bids for Incidental services to the U.S. Navy via OPA approximately 105 times, including approximately 41 separate fraudulent quotes, many of which were submitted multiple times. For the vast majority of such services, GDMA also submitted a bid, and on each occasion when it did, GDMA was the low-cost bidder and was thus awarded the contract to provide the Incidental service.

35.     The investigation thus far has estimated that the absence of competition in the market for Incidental services in Thailand alone, as effected by GDMA through the submission of fraudulent quotations, has resulted in losses to the U.S. Navy of at least approximately $2,300,000.

36.     On September 17, 2013, agents interviewed GDMA's Country Manager for Thailand, in Bangkok. She stated that she knew that, under the contract, the U.S. Navy required three quotations from vendors in the marketplace. She stated that she received target prices or requests for statements of non-availability for each service from LF or WISIDAGAMA. She stated that the reason for this, as indicated by LF and WISIDAGAMA, was to make GDMA's quotation look cheaper than the competition. She then directed her staff at GDMA-Thailand to obtain quotes that met the objectives of LF or WISIDAGAMA by whatever means necessary; and she admitted that she, LF, and WISIDAGAMA all knew that the quotes submitted to the Navy were fraudulent. She provided the quotes she received from her staff back to GDMA headquarters in Singapore for approval prior to anything being uploaded to OPA.

### ii.    *Fuel*

37.    GDMA-Thailand artificially inflated the price of fuel supplied to U.S. Navy ships, and made other false representations concerning these fuel purchases.  As with provisions, pursuant to the contract, GDMA had to supply competitive bids to the U.S. Navy before procuring fuel, and then charge the U.S. Navy at cost for the fuel purchased from the low-cost vendor.  The investigation has reviewed records from the U.S. Navy showing the documentation uploaded into OPA for these ship visits, as well as other materials, and has determined that GDMA also defrauded the U.S. Navy in the purchase of fuel.

38.    In particular, GDMA-Thailand routinely represented to the U.S. Navy that it could not procure from local suppliers the type of fuel that the ships needed (with no biodiesel content).  In fact, GDMA-Thailand uploaded forms into OPA stating that the Thai government required a biodiesel mix in its fuel, and that GDMA thus could not procure the proper fuel in Thailand.  Instead, GDMA asserted that it would import the fuel from its own stocks, as the following quotation from a GDMA approval form states:

> *USN SPEC MARINE GAS OIL (MGO) IS UNAVAILABLE DUE TO THAILAND'S REGULATION THAT DIESEL IN THE COUNTRY MUST HAVE A BIODIESEL CONTENT MIX WHICH DOES NOT MEET USN REQUIREMENTS. GDMA WILL PROVIDE USN SPEC MGO FROM ITS OWN STOCKS WHICH ARE IMPORTED AND CONTAIN NO BIODIESEL.*

The investigation has determined that these representations were false.  The Thai government does not require all fuel to have some biodiesel content.  GDMA did not always supply the ships using fuel imported from its own stock.  Rather, GDMA bought fuel for Navy ships from local suppliers, and then overcharged the Navy.

39.     Emails obtained by the investigation revealed that GDMA management, including LF, WISIDAGAMA, and NP, were intimately aware of and involved in the orchestration of this fraud, directing the fuel purchases and billings for U.S. Navy ships, and receiving profit and loss statements for each ship visit to Thailand which included the fuel details (what was charged to the U.S. Navy and what GDMA actually paid for the fuel supplied). Multiple email exchanges between NP and WISIDAGAMA, often including HP, discussed which items to include in the billings to the U.S. Navy and how much to charge. Many email exchanges between LF and GDMA's lead accountant describe large payments due and total bank balances, including large payments owed to fuel suppliers in Thailand for fuel supplied to U.S. Navy ships.

40.     According to documents I have reviewed, in July 2012, the USS Emory S. Land was planning a port visit in Laem Chabang, Thailand, and requested fuel from GDMA. In several email exchanges starting on July 20, 2012, WISIDAGAMA advised LF that GDMA "need[s] to send a response for the ESL [USS Emory S. Land] fuel… my guess is they probably believe that only GDMA has navy spec[ification] fuel." LF responded to WISIDAGAMA, advising to wait. WISIDAGAMA then replied "If we stay silent too long they may just try their luck via seacard? Could send quote this evening say need confirm by Monday and use the same story that in Thailand only bio diesel mix available?" WISIDAGAMA therefore appears to be a participant in the fraudulent statements made by GDMA to the Navy regarding fuel availability.

41.     According to an analysis by DCAA, the losses to the United States on fuel charges just in Thailand were significant. For just five fuel purchases in the fall of 2011, GDMA overcharged the Navy by over $3 million. GDMA uploaded the same fraudulent information for virtually every port visit in Thailand from September 2011 through at least June 2012.

42.     When interviewed on September 17, 2013, GDMA's Country Manager-Thailand

14

stated that she received similar direction from GDMA headquarters when it came to billing fuel as she received when billing incidentals.  She related that although there are actual biodiesel regulations in Thailand, they do not apply when "exporting" fuel, which applied when selling to the U.S. Navy. She stated that she received direction from both LF and WISIDAGAMA, instructing her to tell the Navy that GDMA could not procure fuel in Thailand due to the biodiesel regulations, which she admitted was false; and that GDMA headquarters in Singapore made the decision not to upload any actual fuel quotes to OPA. She further stated that when it came to contracting issues such as this, she did not actually formulate statements on her own; rather, she forwarded any questions from the Navy to LF and WISIDAGAMA in Singapore, who responded to the questions.  She then used the responses from LF and WISIDAGAMA when making statements to the Navy. She stated that GDMA usually bought fuel from Sea Oil, although occasionally WISIDAGAMA bought fuel from another company, Inter Bunker in Singapore, and shipped it up to Thailand.

### iii.  *Port Tariff Items*

43.    The investigation has also found that GDMA was submitting inflated charges and false documentation to the U.S. Navy for port tariff items.  Under its contract, GDMA was required to bill the U.S. Navy at cost for these items, which are tariffs imposed by governmental port authorities or companies designated by the country's true port authority.  To effectuate this fraud, GDMA created phony port authorities solely to submit inflated bills for services to Navy ships.  Evidence obtained to date shows that LF, WISIDAGAMA, and other GDMA employees were directly involved in the development of these imposter port authorities, and in the tariffs that these entities would bill the U.S. Navy.

44.    The Port Authority of Thailand ("PAT") is an agency within the government of

Thailand, which, according to the PAT's website and other documents reviewed, has the authority for establishing Port Tariff Rates at certain ports in Thailand. For example, at Laem Chabang Port, the PAT website, www.laemchabangport.com, lists tugboats, potable water, berthing and wharfing space, and a few other services as Port Tariff Items and mandates that all ships entering Laem Chabang Port use these port-provided services. The PAT sets the rates for these enumerated Port Tariff Items, which it posts on the Internet.

45.     PAT does not, however, administer the Port Tariff Items itself; instead, it auctioned the rights to administer these tariff rates to various commercial entities. At Laem Chabang Port, there are several commercial companies that have been designated by the PAT, including Hutchison Laemchabang Terminal Ltd. And NYK Line. These bona fide Port Authorities are also found on the Laem Chabang Port's website. The website lists the port operator of each terminal and includes a statement saying when the company was "endorsed" by the PAT.

46.     For example, on October 21, 2011, the USS Mustin arrived at Laem Chabang Port for a 13-day humanitarian assistance mission. In its LogReq, the USS Mustin requested many services listed as port tariff items at Laem Chabang Port. At end of the port visit, on or around November 1, 2011, GDMA presented the Supply Officer with an invoice for the following items billed as "port provided" services:

- Trash removal, $571.23 per trip
- Pilots (In/Out), $1,176.07 each
- Tugs (two units, in/out), $3,528.22 each
- Line Handlers, $1,209.67/job
- Dockage & Wharfage fees, $10,248.65/day
- Potable Water, $26.88/metric ton
- Armed Security Guards, (1 team/shift, 4 shifts/day), $2,016.12/day
- Armed Picket Boat, including in/out, $5,040.32/day

47.     As required by the contract, GDMA submitted invoices that it purportedly

16

received from the Laem Chabang port authority to back up these charges. These invoices are from Laem Thong East Services Co., LTD ("Laem Thong") and they detail in Thai the above charges for Port Tariff Items. The invoices purport to charge GDMA for port tariff items for the USS Mustin, totaling $293,935.29.

48.    Based on emails and other documents which I have reviewed and interviews of witnesses in which I participated, I believe that Laem Thong East is not a bona fide Port Authority and that it is not authorized or endorsed to collect Port Tariff Rates at Laem Chabang Port; instead I believe that Laem Thong East is a shell company, without employees or assets, formed at the direction of LF and used for the purpose of defrauding the U.S. Navy.

49.    Documents which I have reviewed show that Hutchison, the true port authority, billed GDMA for berthing space and port tariff items provided to the USS Mustin in that visit, for a total of just over $35,000.

50.    Emails from October 2011 show that the GDMA-Thailand Country Manager asked WISIDAGAMA and LF to set the supposed port tariffs for the items to be charged by the phony Laem Thong port authority. They also discussed the letterhead for Laem Thong to use. Internal GDMA emails reveal that the Country Manager emailed LF and WISIDAGAMA, seeking to confirm the budget, and LF specifically directed using Laem Thong for all the port tariff items.

51.    Based on the above, it appears that for the visit of the USS Mustin, GDMA paid approximately $35,000 to Hutchison, the bona fide Port Authority at Laem Chabang Port, and meanwhile fraudulently overbilled for the same services. According to the documents I have reviewed, instead of submitting invoices from Hutchison, as required by the HSP contract to support the cost of the Port Tariff Items, LF, WISIDAGAMA and the Country Manager for

17

Thailand participated in fabricating invoices from a shell company, Laem Thong East, which they fraudulently misrepresented to the U.S. Navy as the bona fide Port Authority at Laem Chabang.

52.     This scheme was not limited to Laem Chabang Port. In Phuket, investigators have determined that the bona fide port authority is the Chaophaya International Terminal. However, according to records I have reviewed for every U.S. Navy port visit to Phuket from September 2011 until June 2012, all of the required "Port Authority" invoices submitted by GDMA to support the cost of Port Tariff Items ostensibly come from a company called Phuket International Cruise Terminal ("PICT"). Based on many emails which I have reviewed, as well as the Thai corporate registration for this entity, I know that PICT is registered to LF and the Country Manager, and that the listed address for PICT is, in fact, the address of the GDMA corporate office at the Phuket Port which houses GDMA personnel and equipment. PICT charged the U.S. Navy rates that were significantly higher than what the actual port authority listed as the true port tariffs.

53.     Based on my review of all port visits in Thailand under the Region 2 contract at Laem Chabang and Phuket, I observed that GDMA repeatedly justified its costs associated with Port Tariff Items with invoices from Laem Thong East and PICT, respectively. In each instance, the rates charged by Laem Thong East and PICT were significantly higher than the published Port Tariff Rates offered by the bona fide Port Authority. GDMA's submission of these fraudulently inflated invoices, which totaled more than a hundred, and the incident fraudulent misrepresentation of these companies as bona fide, endorsed Port Authorities, resulted in a fraud loss estimated by DCAA to be approximately $4 million.

54.     Neither was this scheme limited to Thailand. Emails from September 2011 show

LF and WISIDAGAMA setting up a phony port authority for the port of Lumut, Malaysia. On

September 23, 2011, NP wrote the following email to LF and WISIDAGAMA, cc'ing two lower

level GDMA employees:

> *Sir / Alex, For LUMUT PT [Port Tariff] items, we propose to use the same format / approach as KK [Kota Kinabalu, Malaysia]. Using our Local Agent[']s letterhead but understating (FOR LUMUT MARITIME TERMINAL SDN. BHD.) "TARIFF STRUCTURE [] FOR LUMUT NAVY BASE"*
>
> *Four PT's will be used*
> *Pilots @ US$2,200 per move*
> *Tugs @ US$12,000 per job / tug*
> *Linehandlers US$800 per job*
> *Trash US$27 / CM*
> *Water US$38 / MTON*
>
> *Richard will generate the letter head and we will provide input to the content.*

55.     Later that day, NP wrote another email to LF and WISIDAGAMA, asking their

opinion about letterhead he created for Sea Winds Maritime Sdn. Bhd. NP attached a PDF

document called "LUMUT – Port Tariff 2011.pdf," which was purportedly a schedule of Port

Tariff Items from Sea Winds Maritime, priced exactly the same as NP had set forth in his

original email of earlier that day. According to the metadata of this document, it was created on

September 24, 2011, with the listed author as [N] [that is, NP]. Investigating agents have

determined, however, that the bona fide Port Authority in Lumut, Malaysia is the Lumut

Maritime Terminal Sdn. Bhd, not Sea Winds Maritime. In what I understand to be an effort to

confuse the U.S. Navy about the true identity of the Port Authority in Lumut, and thereby allow

GDMA to charge fraudulently inflated rates for Port Tariff Items, NP also stated in this email

that he "tried to make it as complicated as possible."

56.     In subsequent emails, LF, WISIDAGAMA, and NP discussed changing portions

of the Sea Winds Maritime letterhead and adding the names of other ports, including exchanging

versions of Microsoft Word documents that demonstrate the evolution of the Sea Winds document as various GDMA employees made changes. On September 26, 2011, NP instructed the GDMA General Manager for Malaysia, via email, with LF and WISIDAGAMA cc'd, to "fax [the port tariff schedule] up and down and then scan it again." Based on my training and experience, I believe these instructions reflect an effort to make the document look weathered, and thus deceive the U.S. Navy into thinking that the schedule had been sent to GDMA by Sea Winds Maritime, as opposed to GDMA creating the schedule itself. In any event, the rates established by GDMA (d/b/a Sea Winds Maritime) as the purported Port Authority at Lumut, Malaysia, were substantially inflated over the rates for the same Port Tariff Items published on the Internet by Lumut Maritime Terminal, the bona fide Port Authority.

57. In addition to the above examples, investigating agents have uncovered evidence that LF and WISIDAGAMA, and/or others on behalf of GDMA, similarly created fraudulent Port Authorities and submitted fraudulent invoices for Port Tariff Items at greatly inflated costs in at least four other ports: Sepangar, Malaysia; Bali, Indonesia; Langkawi, Malaysia; and Ream, Cambodia. In just one example, in Bali, LF sent an email dated November 10, 2011, instructing NP, WISIDAGAMA, and the GDMA General Manager for Indonesia to inflate the cost of picket boats, a Port Tariff Item, 1,500% for the port visit of the USS Essex on November 20, 2011.

58. When interviewed on September 17, 2013, GDMA's Country Manager-Thailand told investigators that she, in cooperation with WISIDAGAMA, created letterhead for Laem Thong East Services and set the prices contained within invoices. She recalled that the reason GDMA used Laem Thong East Services to bill the Navy instead of the actual invoices from the bona fide port operators was that the fixed prices of the contract were too low to make GDMA's

targeted profit margins.  She stated that WISIDAGAMA had to approve all charges regarding port tariff items.

59.     GDMA's Country Manager also stated that PICT is a registered company, but is just in the planning stages for actually being a port operator. It has no employees, and all bills provided to the U.S. Navy on PICT letterhead were created by GDMA employees.  She stated that in actuality, when US Navy ships make port calls in Phuket, GDMA arranges for port services with Chaophaya Terminal International Company, the legitimate port operator for the Phuket Port.  She stated that either WISIDAGAMA or LF instructed her to use PICT letterhead to bill the US Navy for port tariff items in Phuket.

60.     She further stated that she occasionally received questions from the Navy about these port tariffs, and she forwarded those questions to GDMA Singapore, which provides her a response to send. She also admitted that neither Laem Thong East nor PICT were legitimate port operators, that they did not have any employees, and that they did not have the authority to operate a pier from the PAT.

## C.   <u>Conclusion</u>

61.     Based on the foregoing, I respectfully submit that there is probable cause to believe that beginning at least in or about September 2011, LF, WISIDAGAMA, and others conspired to defraud the U.S. Navy in the performance and billing of GDMA's Region 2 contract in violation of 18 U.S.C. § 371.  Specifically, as set forth above, the co-conspirators knowingly and unlawfully (1) submitted and caused to be submitted fraudulent competitive quotes for Incidental services, thereby allowing GDMA to win the award for those items without regard for the competitive prices prevailing in the marketplace; (2) submitted and caused to be submitted fraudulent quotes, and made other fraudulent misrepresentations regarding the purchase of Fuel,

thereby allowing GDMA to charge inflated prices to the U.S. Navy, rather than what GDMA

actually paid for Fuel; and (3) submitted and caused to be submitted fraudulent invoices from

non-existent Port Authorities, thereby allowing GDMA to charge inflated prices to the U.S.

Navy, rather than what GDMA actually paid to the bona fide Port Authorities.

Respectfully submitted,

James McWhirter
Special Agent
Defense Criminal Investigative Service

Subscribed and sworn to before me
On October 11, 2013

THE HONORABLE JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

22